All right, first case is Pollock v. Energy Corporation of America, numbers 15-2648 and 15-2649. You may proceed, counsel. Thank you. May it please the Court, my name is Nicole Bagnell, and I represent Energy Corporation of America. I would like to reserve five minutes for rebuttal. Okay, that will be granted. By failing to enter judgment as a matter of law or grant a new trial, the District Court erred by ignoring the plain language of the contracts between the party, the leases. The contracts say that the plaintiffs received one-eighth of the net proceeds received by ECA for the sale of the gas. The District Court looked at the wrong proceeds from the wrong sale and ignored the plaintiff's stipulation that the sale was from ECA to EMCO. Does the contract... Go ahead. That was funny. Did the contract say anything about when title passes? The contract between the lessor and lessee does not. The contract between ECA and EMCO does. It says that a title passes at the point where the buyer, the third-party buyer, EMCO's buyer, takes possession. Okay. How come... Here's what I don't understand. I thought that in order to be in line or in compliance with federal regulations, the title had to pass when the gas entered the pipeline. No? No. All that has... As I understand it, Your Honor, although this was not an issue in the case, all that has to be shown is that the party who is shipping or incurring the costs of transport is the one who holds title. So in this case, that would be ECA. They held title up until the point of the third-party buyer, and they incurred the transportation costs. Just as a general, I guess, introductory matter, you've got a high hill to climb. You've got a jury that's out against you. That may be that the standard makes all the difference in this case, but we do have to look through this, you know, through a certain prism that requires quite a lot from you. Sure. The review is plenary, and it requires that we show that there was an error of law. Well, plenary is the legal questions. And, Your Honor, we believe that it was only legal questions that are an error. This is a really rare case. Almost all of the facts that are at issue were stipulated to or were uncontradicted at trial. So what facts are at issue? There really aren't any facts at issue. The critical facts are that ECA sold the gas subject to the leases to EMCO. That fact was stipulated to by the plaintiffs. You say there were no facts at issue. Then why did you have a trial? The critical facts. Well, Your Honor, I don't think we needed a trial. I think the plain language of the lease shows that ECA paid the plaintiffs one-eighth. I guess the one issue that would – the issues, as I said, there was the ECA sold the gas subject to the leases to EMCO. That was stipulated. That EMCO was a separate corporation and that ECA – corporation from ECA and that EMCO was an independent purchaser of ECA's gas without regard to its status of an affiliate. Yeah, but counsel, I mean, I read the transcript and I read both sides, particularly regarding O'Malley and Farkhof, I guess. Yes. And both sides have sort of a different take on that. That's a dispute, right? There are a few things that the plaintiffs and the defendants disagree to as to the testimony, but the testimony is the testimony. And the only thing that the plaintiffs say is that they disagree or that those parties, those witnesses should not be believed. But they don't present any contradictory evidence. So, for example, both O'Malley and Farkhof affirmatively testified that no deductions were taken. There is no contradictory evidence. The only other witness that the plaintiffs presented was their expert, Julia Bonner. She did not testify at all as to deductions. She did not address that issue in her testimony at all. She testified to an entitled pass, right? Yes, but that – you only get to that question if you find that there were deductions. There's no testimony that any deductions were taken. On the title issue, she should not have been admitted as an expert. When you say deductions, are you talking about post-production? Yes, Your Honor. So the first sale occurred from ECA to EMCO. That was the sale that's relevant under the lease. From the money that ECA received for selling the gas, it did not reach any deductions. I thought that there were certain sales that went ECA right to the third party and then certain ones that went from ECA to EMCO, the third party. No, it was stipulated, Your Honor, by the parties, and it was part of the trial record that the only relevant sale was the sale from ECA to EMCO. And that's in the record at 1859. Now, there was a question about when title passed. If you get to that question, if you find that there were deductions, then it's clear from the contract between ECA and EMCO where title passed. But you don't need to get that far because the plaintiffs did not present any evidence that deductions were taken from that sale, which they stipulated was the relevant sale. The only testimony they rely on— You said they stipulated. Are you talking about an interrogatory? No, Your Honor. There's a stipulation in the record, and there were also pre-trial stipulations between the parties. The pre-trial stipulations are in Document 204, but they were read to the jury at the trial in Joint Appendix 1859. And the stipulation was number five on the stipulations. During the period of November 22, 2006 through March 26, 2012, ECA sold the gas produced from the plaintiff's leases to Eastern Marketing Corporation, EMCO. That was the stipulation. That was the sale. If you read the plain language of the lease, that's the only relevant sale. It is the proceeds received by ECA for the sale of the gas. It was undisputed that EMCO paid ECA by check each month for the gas that it bought. It was undisputed that ECA paid royalties to plaintiffs equal to one-eighth of the amount received in that check from EMCO, with no deduction. Again, this is uncontradicted evidence. I don't understand something. Are you making the argument that there were never post-production deductions prior to the one-eighth calculation? That's right, and that's what was stipulated, too. Like never, as in not in the record, never? Not in the record and never. Never. Not in the record, stipulated to, didn't happen. EMCO paid ECA every month by a check. ECA took one-eighth with no deductions and paid it to the royalty owners. I'm sorry, Your Honor. It's okay. Let me ask this question. Are you saying there was no deduction between ECA and EMCO, or there was no deduction at any point between ECA and the third parties? Because there had to have been a deduction between the third parties and EMCO, right? Otherwise, there's no reason to have EMCO. I would not call those deductions. The price that was paid by EMCO to ECA pursuant to their contract was a transparent one. Okay, let me ask a different question. Okay. Is it your position that there were no post-production costs incurred in the transaction between EMCO and third-party purchases? I thought that's what the entire trial was about, and if it's not, then I've got to go back to the short report. Yes, there were costs incurred by ECA for activities undertaken by EMCO. So EMCO marketed the gas, and there was a fee for that marketing. And the gas was transported to the third-party buyers, and there were costs for that. But those all occurred after the relevant sale in this case. Also, Your Honor, those all occurred, those were never deductions from the royalty paid. These were costs reflected in the price that EMCO paid to ECA for the sale of the gas. I can't help but just think, is this just, I mean, from maybe your side, maybe it's just a bad deal the way they structured it. Because, I mean, you know, we've got this other company that's doing all the marketing and all the sales, the third parties. And it's just kind of passing along the price. I mean, ECA were doing it great, but it wasn't ECA. They just passed along their cost, I guess. It's not a bad deal, Your Honor. It complies with both the contracts, the contracts between ECA and the lessors under the leases that say they'll get one-eighth of the net proceeds from the sale. And the sale, as stipulated to you, was to EMCO. And it's also not a bad deal if you look at the contract between ECA and EMCO. ECA gets paid for its gas, the price received by third parties, less the fee for marketing, which ECA had to do marketing, and less the cost of transportation. It was a very transparent sale, in fact. The fact that the price paid by EMCO to ECA was transparent is really why we're here. If EMCO had just said, I'm going to pay you $8, don't ask why, the plaintiffs wouldn't have any claim because they wouldn't even know what those costs were. It's a third party, and it's not relevant under the lease. It's only because they're really being penalized for having a transparent contract where it shows exactly how they came to the price that they paid. I mean, it's the same way as when you go to the grocery store and buy groceries. The cost of those groceries reflects the cost of growing the food and packaging it and getting it to the store. But that doesn't mean that there are deductions that you're paying that are separate from the price paid. It's the same here. The same thing happened. There was a contract. There was a point of sale. That's the only thing that's relevant to the lease. If you look at the second sale, which you shouldn't under the plain language of the lease, but if you do, the second sale is only raised by plaintiffs because of the higher price. When you say the second sale, you mean the sale between EMCO and third parties? That's right. Okay. Not the one that was stipulated to as relevant, but the one that the plaintiffs focus on, or is relevant under the lease. If title never passes from ECA to EMCO, then why should we only look at the EMCO third party transaction? You shouldn't. You should only look at the ECA to EMCO transaction. That's the only relevant one under the lease. If you look at the second sale, which isn't relevant under the lease, but if you look at it, then you still have to look at the plain language of the leases, which say that the lessors get the net proceeds from the sale of the gas. The net means that the price paid downstream is less cost, like transportation and marketing, which are deducted. If ECA had control all the way to the third party sale, which we do not believe the stipulations or the facts support, but if they did, you can't pick and choose. If they had control all the way, then they incurred the costs. No disputes of the amounts paid to the plaintiffs is the same either way you properly apply the lease terms. All right. We'll hear from you on rebuttal.  Good morning, Your Honors. Good morning. Robert Sanders, counsel for the landowners that were paid the royalties. With me is David McGowan from the Pittsburgh law firm and also Susan Meredith from Pittsburgh. Seems like a pretty easy case. It's an incredibly simple case. As simple as it may seem to all the folks from West Virginia. I'm from Jersey, so it's hard. I was born in Montclair, so all of our people were from Jersey. I think I'm just going to let that one go. Okay. So I'm stuck on the ECA-EMCO focus and then EMCO to the third parties. Now, here's what I don't understand. We're only supposed to focus on EMCO and ECA, but EMCO never has title. So how is there a sale if EMCO never has title? Am I not looking at this the right way? Well, it was agreed by all of the witnesses that there was a sale to EMCO. Their people all admitted there was an actual sale. Now, whether the title went from ECA to EMCO and then from EMCO to the third parties or whether it went directly to the third parties, we don't believe that distinction really matters in this case. Now, the one key fact that I think is dispositive is that opposing counsel said there was no evidence that there were any deductions taken. And this is a threshold issue. We only have a problem if there was a deduction taken from the royalties. There was compelling evidence at trial that deductions were taken from the royalties, and they came right from the mouth of Mr. O'Malley, who was the chief financial officer of Energy Corporation of America. He said that in the royalty statements that were sent to our clients, the deductions of these costs were reflected in those royalty statements. They would not be reflected in the royalty statements if they weren't deducted from the royalties. I then asked him a follow-up question. I said, question, which means since those expenses are reflected on the royalty statement, it means the royalty owner ended up paying a share of those expenses. Here's his answer. They bear a share just as allowed under the leases. Mr. O'Malley is… Can you give us a page reference on that? That reference is JA 1629-1630. To me, that's a critical admission by their chief financial officer. They bear a share, one-eighth, just as is allowed under the leases. He's referring to a share of these very costs that are at issue. That would be the transportation charges and the marketing fees. The jury could reasonably conclude, hearing that, that there was a deduction from the landowner's royalties for these charges. The counsel said there was no evidence that there were any funds deducted from the royalties. That's refuted by their chief financial officer. It's also refuted by the fact that the payments went directly from the third parties to ECA. They did not go to ENCO. ECA received them into an account, which Mr. O'Malley acknowledged was controlled exclusively by ECA. It was their account. They owned it. They controlled that money. Therefore, it follows a fortiori that any deductions taken out of that money thereafter had to have either been taken by ECA or under ECA's direction. Therefore, any deductions taken from the gross proceeds paid by the third parties had to have been deducted by ECA. On the threshold issue, which I think is the threshold issue, were there deductions taken from the royalties? The answer is clearly yes. Certainly, there was sufficient evidence for a jury to so find. Are they reflected on these sheets? I'm looking at J.A.'s 1969 Exhibit 18 at trial. That's one. It looks like they are. It's hard to read. I read the transcript to try to understand it, but it does look like there are deductions taken on these sheets, right? Yes. The confirmation sheets I'm talking about. Yes. I think on point one there were deductions taken, but we don't run our case just by showing there were deductions taken. We have to show that they were improper. One way they were improper is if they weren't incurred. We don't even have to get to the question of where title passed if they weren't even incurred. Our argument is that on both of these costs, the evidence was clear that the costs were not even incurred. If you agree that there was sufficient evidence that the costs were taken out, and if you also agree that they were never actually incurred, then the plaintiff's verdict has to stand. I think your adversary argues that ECA was okay passing the costs along to you and that the contracts actually provided for it. What's your reaction to that? I'm not quite sure I understand the question. Listen, you're saying that these things were improper. They're saying the contracts allowed it. The contract allows it, but the lease only permits you to take costs that you incur. You can't imagine costs and then take them out that actually you never paid. A gas producer, if he incurs a cost in getting the gas to market, can require the landowner to share a burden of it. But what if the cost is never even incurred? And here's why the costs were not incurred. The transportation charge, which is the smaller of the damages, but the charge for interstate transportation, the charges charged to the third-party buyers included a surcharge, and that surcharge varied depending upon where the gas was delivered in the United States. Sometimes it was 50 cents and sometimes it was as much as $1.50. The question at trial, a fact issue, is what is that surcharge? Because the price the third parties paid had two components. There's a base charge per unit, a commodity charge, and then there's the surcharge. It came out at trial, and the jury heard this, that the surcharge was the cost of transporting the gas to the third-party buyer where the third-party buyer received it. Therefore, the third-party buyers paid the transportation, interstate transportation. It was subsumed in the price they paid, and therefore ECA could not then turn around and also take out transportation from the landowners if they were made whole already because the third parties paid it. The relevant testimony on this point was from Randy Farkosh, who was the director of marketing at ECA. This is at JA 1672-1673. My question to him is, I was trying to understand what that 50-cent surcharge is. In other words, there's a price, but the third-party isn't just paying the index price, it's paying an additional 50 cents. I believe, if I understand you correctly, that 50 cents is the cost of having the gas delivered at the point on the interstate system that the buyer wants it delivered. Correct. Answer? Yes. So, the buyer is paying it, and yet ECA turned around and deducted it from the royalty. That's why the transportation charges that were deducted must be reimbursed to the landowner. The reason the marketing charges were not incurred, moving over to that one, is that Mr. O'Malley admitted at trial, as did other witnesses, that the marketing charges were with respect to the second sale. They were. ECA did not incur any marketing charges to sell it to its own affiliate. The marketing charges were when the affiliate, MCA, was going out and finding third-party buyers. Therefore, it was a cost that EMCO incurred in reselling the gas to its customers. It wasn't a cost that ECA incurred in selling the gas to EMCO, and yet ECA deducted it, even though it didn't incur it. In other words, EMCO was the marketer. EMCO incurred the market. So, very basically, both charges, both post-production costs, arise in the EMCO third-party contract or relationship after the ECA-EMCO relationship is technically over. The surcharge that's going this way, that's charged EMCO to the third-party buyer, is subsumed in a price, and then there's the second cost that's incurred between that EMCO is charging the third party, and that that represents a higher number, which should be the number that royalties are calculated from. And then the evidence that you've just alluded to shows that. So it shouldn't be the ECA-EMCO relationship. It should be the ECA third-party relationship that we look at, because that represents a higher number, which your clients should be deriving their one-eighth of the royalties from, rather than the lower number that arises between ECA and EMCO. Judge Greenaway, you're absolutely correct, and the reason you're correct... I'm correct. That's your point. Right. But you're correct from New Jersey. The reason you're correct is that the lease language says... There was no stipulation that you have to look at the sale between ECA and EMCO to determine the deductions. The lease language says that one-eighth of the net proceeds received by ECA. It didn't say realized by ECA. It's one-eighth of the net proceeds received by ECA. It's undisputed that ECA received the gross amount, which included embedded in it the net amount. So ECA, in order to determine what is the net we have to pay the landowner, it takes the gross amount that it received. There's no dispute. It received it, not EMCO. The third-party has never paid EMCO. They paid ECA. The question is, what can ECA then take out of it? Properly, legally take out of that amount of money that the third-party has paid. And that is where we have our dispute. We're saying that since ECA received that full amount, the only cost that could come out was a 52-cent gathering fee, which is not a dispute in this case. That could come out because that was incurred while ECA owned the gas. The other two expenses could not come out of those gross payments because, number one, they weren't incurred for the reason I just explained. ECA never incurred them. But even if one were to take a tortured view that ECA did incur them, then we get into this whole complicated question about who had title when the expenses were incurred. And we think the testimony is clear that ECA no longer had title to the gas when these expenses were incurred. But that is a third-level issue you have to get to. The first one is, did ECA take deductions? The answer is clearly yes, because of the testimony of O'Malley saying that they bear a share of it. So the deductions were taken. Then you have to ask, well, were they incurred? And we say, no, neither one was incurred. But if you reject that and say, yes, they were incurred, well, they're still not permissibly deductible because they were incurred after title to the gas passed. And on that point, there was a summary judgment. We don't have to go too much into the weeds of the case. But the chief judge of the Western District entered a summary judgment in favor of the named plaintiffs that the title to the gas passed for their gas before the gas entered the interstate system. Ergo, before there was marketing fees, before there was interstate transportation. So we think this is actually a very simple, straightforward case. And the standard, as you indicated, Your Honor, is the respect given to a jury is quite deferential. It doesn't mean that you all have to think that you want to come up with that verdict. The question is, was there sufficient evidence for a reasonable person to get to that point? And I think there is no question that there was and that the plaintiff's verdict should be sustained. One other point. It was brought up by your adversary about the motion for a new trial. Generally, we're accustomed to reviewing a new trial under an abusive discretion standard. Instead, for some reason, the trial court viewed it as a motion to reconsider. We consider evidentiary objections as part of new trial motions all the time. Did the district court get it wrong? Shouldn't we send the new trial motion back to be decided under the proper standard? Oh, I think the question was decided at the Dover hearing, which is the same issue. It wasn't Ms. Bottomer qualified to give her testimony. And the court said that she was qualified to do it. Right, I understand that. And that she did testify. Right. And now, so your question is? Well, the basis, a proper basis for granting a new trial could be, hey, I made a mistake on evidence. It wasn't fair and I've got to send it back for a new trial. Right, but you're saying that the standard the judge applied in permitting her to testify. No, no, the standard she denied the motion for a new trial on was the standard for motion to reconsider, which is a different standard than for a new trial. So motion to reconsider is abusive discretion? No. Okay. A new trial is. Okay, and then the standard for the other scenario is a different standard. It has to do with did they get the, gosh, I can't remember exactly what it is, but is it new, did they miss controlling law along those lines? Well, yeah, now I understand your question. I don't think under either standard the decision to permit her to testify was correct. Okay. All right. Is there anything else? No. Actually, I want to ask one question on this, just one second. Maybe the appellate could deal with that when they get back up. I'm good, actually. Thank you very much. Thank you, counsel. A few points, Your Honors, just on the questions that you asked. EMCO does get title to the gas back-to-back right at the point where it goes to the third-party buyers. So ECA holds title to the point where the third-party buyer takes it. EMCO has title and then per the contract it goes to the third-party buyers. You said that too quickly. There is a point where EMCO holds title. It's very briefly at the point where the third-party buyer receives it. So ECA holds it until the point of the third-party buyer. At that point, EMCO briefly holds it and gives it to the third-party buyer. What does that mean, it briefly holds it? It holds title per the contract. No, I'm asking you, what does it mean when you say it holds it briefly? You mean it holds it on the day of the sale? Yes, at the point where it is transferred to the third-party buyer by EMCO, it holds title. So there's a point in time where there's been a sale between ECA and EMCO because there's not a third-party buyer at that initial point, and that title remains with ECA until a third-party buyer is found, and then just before the sale occurs, then EMCO briefly holds title. That's not exactly correct, Your Honor, because there has to be a third-party buyer before the gas enters the interstate system, and so when EMCO does the marketing on behalf of ECA to find the third-party buyer, that's prior to the part it enters the system, but contractually what occurs is ECA holds title until the point the third-party buyer takes it on the system. But, Your Honors, the point is... But EMCO does take title at some point, albeit brief. Yes. Like Judge Greenway handed me his pen and I handed Judge Estrepo. And that's how brief it is, right? Yes. Okay. But, Your Honors, as I stated before, the district court looked at the wrong proceeds from the wrong sale per the stipulation, but even if you look at the second sale, you can't do what the plaintiffs here ask. You can't only look at the second sale but ignore the costs. That results in the plaintiffs receiving the gross proceeds, not the net proceeds, as they're required to receive under the leases. The court rewrote the contracts when it found that. No one testified that any deductions were taken. They testified that the costs were reflected in the amount that ECA received from EMCO. That goes back to the example I gave about the grocery store. Your costs are reflected. That doesn't mean deductions are taken. They presented no case on marketing. They confused who did the work with who paid. EMCO did the marketing on behalf of ECA because they couldn't get their gas into the interstate system until they had a third-party buyer. And on transportation, the contract says where title transfers. They don't look at the benefit of the higher third-party sale, but they ignore all the costs to get it to that third-party sale. You can't mix and match. Just as the Occidental Court said, you have to either look at the first stipulated sale between ECA and EMCO where there were no deductions, or you look at the second third-party sale and include the deductions. Either way, and plaintiffs admit this, the amount of money the royalty holders receive is the same. What's the difference in the relationship between the plaintiffs and ECA now? There's no EMCO. There's no EMCO. They receive the exact same amount. They get the 10 minus 2. The costs are deducted. They get their 1A. It's the exact same. They're paid the exact same amount. The marketing fee is deducted. The transportation costs are deducted. And then they get their 1A. That's met. And they state in the trial that that's appropriate. The same is true here. You look at the first sale to the first buyer as they stipulated. It's also the case, I just wanted to point out, in the record 1969 that you noted, that's actually an EMCO document. It's always true that if you sell gas down the street, you get a higher price. That was the only point that Mr. Farhash was making in the testimony that Mr. Sanders cited. If you sell it closer to where the buyer wants it, where there's higher demand, you get a higher premium price. That doesn't mean that the buyer is paying the deduction. It just means that your costs are covered, that you have higher costs to get it there, and you receive a higher price. Yeah, but it does mean that there is a transportation cost that is included within that you can't calculate before the gas enters the pipeline. You can calculate what the transportation costs are, and that's what EMCO did when it determined the price that it paid ECA. It looked at the cost it got from the third-party buyer, the price it got from the third-party buyer, the cost it got to transport it there, and the fee it was entitled to for marketing the gas. I thought you started today saying that the sale between ECA and EMCO occurred before the gas went in the pipeline. That's right, the sale, as it was stipulated to. Title didn't transfer per the contract at that point. A moment ago you said that you already know what the transportation costs are at the time of the sale between ECA and EMCO, and that can't be because you don't know who your third-party buyer is at that point in time. If I said that, I would have spoken on it. But you do know who the buyer is because you have to have a buyer lined up before it can enter the interstate system. So EMCO does its work before the gas ever gets onto the system. It lines up a buyer, it does the aggregation and all of those other things before the gas enters the system. On the topic I asked your adversary about at the very end, what is your position on the motion for a new trial? Did the district court get it right in terms of the standard of review? No, the district court got it wrong on all counts. The district court got it wrong. It excluded the testimony, but it also had the wrong standard. It wasn't a motion for reconsideration. It was a motion for a new trial, and that's the standard that should have been applied because her testimony should not have been admitted. Let me ask you a question. If it's a review of the Dauber motion, right, and he grants the review and says, you know what, I made a mistake, she should never have testified, why isn't that a motion for reconsideration? Because presumably if he grants that motion for reconsideration, you strike this bottomer's testimony, and then you say, well, judge, you now have to give us the relief we seek. We don't want a new trial. We don't want judgment not standing the burden. That's what I understand. So why is that wrong? Because it wasn't a review of the Dauber motion. At trial we raised objections. After Mr. Sanders put on her basis for being an expert, we raised objections. The judge ruled on those objections. He initially found that the fact witnesses said were title passed, and so bottomer isn't in a position to do that, and he excluded her testimony. Then he changed his mind and said, I've rethought it, and not permitting her would cut the basis out, would cut the floor out from under the plaintiff's, so I'll go back and allow her to testify. Just please stop there. If he says that not allowing her testimony would take the floor from underneath the plaintiff's, if you ask for review at the end of the trial and he grants you review and says, I'm going to strike her testimony, doesn't that give you judgment not standing the burden? Because you'd say, Judge, they have nothing, right? You've now stricken her testimony. You need to give us judgment not standing the burden. I'm not understanding why you want a new trial at that point. I mean, I understand you're good for a new trial, but I don't understand why you want us to send it back So he'll apply a new trial standard when what you were asking for was to strike Bottomer's testimony. Yes, Your Honor, I agree with you. We did ask for that in the alternative. The first thing we asked for was that the testimony be stricken and then as a matter of law, that judgment be entered. But to the extent that that was not the case, the judgment can't be entered as a matter of law while asking for a new trial because the jury improperly heard her testimony. We believe that judgment should be entered as a matter of law. Thank you. Thank you, Counsel. We'll take the case under advisement and thank you for excellent arguments, both written and oral. And if you have no objection, we'd like to greet you.